THE HIGH POINT COAL COMPANY

*v.*

EAST TENNESSEE IRON & COAL COMPANY

(*Knoxville,* September Term, 1956)

Opinion filed December 7. 1956.

CREEKMORE, BUHL & THOMSON, Knoxville, for complainant.

JEROME TEMPLETON, Knoxville, for Lendon Baird, Receiver.

FOWLER, ROWNTREE & FOWLER, Knoxville, for defendant.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

This appeal is here directly from the Chancery Court on a stipulation of facts. The sole question is who is entitled to $4,500 now in the hands of the Clerk and Master which the Receiver of the Five Point Coal Company obtained by selling copper wire which was in use as trolley wire in the coal mine of the High Point Coal Company when it ceased operations and the lease was terminated.

The relevant parts of the stipulation are as follows:

"1. This stipulation is intended to set forth facts necessary to determine the ownership of the items referred to in Order entered herein on December 16, 1955, by the following language: 'the copper wire in place, valued at $4500 * * *.'

"2. The lease dated October 15, 1944, and renewed December 16, 1954, in which East Tennessee Iron & Coal Company was Lessor and High Point Coal Com-

pany was Lessee, being respectively the defendant and cross-complainant, and complainant and cross-defendand, in this cause, was a valid and subsisting lease between the parties until terminated by action of the Lessor; and said lease is correctly shown in the record as exhibits to the pleadings of said two parties.

"3. Section 8 of said lease in part provides that the Lessee '* * * will at the expiration or termination of this lease leave and surrender to the Lessor the premises hereby demised and mentioned, with all the mines, entries, openings, tramways, chutes, tracks, rails, inclines, houses and appurtenances in good working order and condition. * * *'

"4. The 'copper wire in place' referred to in the Order of December 16, 1955, as being valued at $4500 is the trolley wire above tracks located inside and outside of the mine at the time of termination of the lease, being an overhead trolley wire through which electricity was provided for the operation of electric mine locomotives.

"At termination of the lease, said trolley wire was held in place by clamps which were in turn affixed to the roof or ceiling. 'The wire is readily removable from this form of attachment and it is customary in mining operations to remove trolley wire from one entry, where it is no longer necessary in the operation at that point, to another entry or haulway for reattachment and use in the new location.' "

The Lessor claims the proceeds on the theory that the wire was not only a part of the "tramway" which had to be surrendered to the Land Company at the expiration of the lease, but that the wire was also

necessary to the "good working order and condition" of the tramway and the mine as a whole.

On the other hand the receiver claims the proceeds on the theory that these provisions above quoted did not apply to the copper trolley wire.

The Chancellor held in favor of the receiver, from which the Lessor appeals.

With reference to Lessor's first insistence, that is that the word "tramway" would necessarily include the wire through which the motive power is supplied to operate the cars along the track, we are of opinion that the word "tramway" must be given its common and ordinary meaning, unless there be something in the lease contract which would take the word out of its ordinary meaning.

In the several dictionaries which we have consulted with reference to the definition of the word "tramway" the word appears to have several different meanings, but in none of them is there any reference to the kind of motive power used in the operation of the tramway. For example—Funk and Wagnalls New Standard Dictionary (1914 Ed.) the word is defined as "1. A street railroad; also, any light railroad for temporary use as at a dumping-ground. 2. A roadway having plates or rails on which wheeled vehicles may run. 3. A tram-rail or ropeway for use in transporting logs. 4. A gutter, groove, or similar attachment for pool or billiard tables to expedite the collecting of the balls. Tramroad—aerial tramway, a tramway in which a car or basket is operated over a suspended cable-way or rope-way."

In the 1938 edition of the New Century Dictionary a tramway is defined as a "tramroad," and a tramroad is defined as "a road or track orig. in mining districts, formed of parallel lines of wooden beams, lengths of

stone, iron plates, or rails, for wheeled conveyances."

The latest editions of various dictionaries have substantially the same definitions. Then turning to 87 C.J.S., 886, tramroad or tramway is defined as follows: "The terms, which have no settled or well-defined meaning, are treated in connection with railroads generally in Railroads sec. 1a (2) (a), and in connection with street railroads in Street Railroads sec. 1."

In some localities the word "tramroad" is usually applied to a road constructed with rails spiked down on it like a railway, such road being used generally for hauling lumber or for transporting coal from mines which are owned and operated exclusively for the benefit of persons who own the timber or the product of the mine, and which is not operated as a common carrier.

The term "tramway" sometimes designates a platform which is used to carry away lumber from the sawmill.

Then when we turn to 83 C.J.S., Street Railroads, sec. 1, p. 127, where the term, street railroad, is defined, we find that the text states as follows: "Motive power. The motive power by which the cars are operated is immaterial as affecting the character of a railway as a street railway, whether animal, or mechanical, such as electricity, cable or even steam."

It will be observed, therefore, that the ordinary meaning of the word "tramway" is simply the rail or groove or cable along which the vehicle sometimes called a "tram" travels, and that the word does not include the vehicle itself. Nor, therefore, as aptly stated by counsel, would it include the mechanism by which the vehicle is propelled, whether it be by horse or electric motor, nor would it include the energy which activates the mecha-

nism, nor the means for the transportation of this energy, whether it be "by copper wire, pipe-line, a galvanize bucket or a pitchfork."

It would seem to follow necessarily then that appellant's second insistence must fail because if the word "tramway" does not include the said copper wire, then it cannot be said that this wire was necessary to the "good working order and condition" of the tramway and the mine as a whole.

We find nothing in the lease contract to take the word "tramway" out of its ordinary meaning. As a matter of fact—when the original lease was executed in 1944, section 11 thereof indicates that horses and mules were used because that section provides that upon the expiration of the lease the Lessee would be the owner of all the "machinery, apparatus, working tools, and implements used in mining, horses, mules, cars, engines, boiler, pumps, winding drums and ropes of wire or cordage used therewith, and weighing scales."

It is, therefore, not surprising that trolley wire is not mentioned in section 11, as being part of the property to belong to the Lessee, because the same was not in existence at that time; thus the argument of the appellant to the effect that the failure to mention trolley wire in section 11 re-enforces his claim with reference to section 8, falls by the wayside.

While it is true that under section 4 of the above stipulation the trolley wire is referred to as being the wire through which electricity was provided for the operation of the electric mine locomotives, there is, however, nothing to show when the use of electricity in this manner was commenced; and since there was no change

in this part of the lease which was renewed in 1954, it must be presumed, in the absence of any proof to the contrary, that the same conditions prevailed at the date of the renewal of the lease as prevailed at the inception of the original lease.

It is our opinion, therefore, that the decree of the Chancellor is correct and the same is affirmed.